[No. B224869. Second Dist., Div. Seven. Aug. 9, 2011.]

CITY OF PALMDALE, Plaintiff and Appellant, v.
PALMDALE WATER DISTRICT et al., Defendants and Respondents.

**COUNSEL**

Wm. Matthew Ditzhazy, City Attorney; Richards, Watson & Gershon, Gregory M. Kunert and Whitney G. McDonald for Plaintiff and Appellant.

Lagerlof, Senecal, Gosney & Kruse, Timothy J. Gosney, James D. Ciampa and Francis J. Santo for Defendants and Respondents.

Daniel S. Hentschke for Association of California Water Agencies as Amicus Curiae on behalf of Defendant and Respondent Palmdale Water District.

OPINION

WOODS, J.—

## INTRODUCTION

In this appeal, the City of Palmdale (City) asserts the trial court erred in finding the Palmdale Water District (PWD) had adopted a new water rate structure in conformity with the constitutional requirements of Proposition 218.

After conducting an independent review of the record (*Silicon Valley Taxpayers' Assn., Inc. v. Santa Clara County Open Space Authority* (2008) 44 Cal.4th 431, 448 [79 Cal.Rptr.3d 312, 187 P.3d 37]), we conclude PWD failed to satisfy its burden to establish that its new water rate structure complies with the mandates of Proposition 218 (as set forth in art. XIII D of the Cal. Const. (article XIII D)), including the proportionality requirement, which specifies that no fee or charge imposed upon any person or parcel as an incident of property ownership shall exceed the proportional cost of the service attributable to the parcel. Accordingly, we reverse the judgment.

## FACTUAL AND PROCEDURAL SUMMARY

As of 2008, PWD revenues had decreased by about $1.3 million ("primarily due to a decline in water sales"), while its expenses had increased by about $1.2 million in 2008 (and $2.4 million in 2007). PWD's general manager concluded a 15 percent rate increase was necessary to balance the budget.

At a cost of $136,000, PWD retained Raftelis Financial Consultants (RFC) to prepare a rate study and recommend a new rate structure. According to RFC's water rate study report, PWD serves a population of approximately 145,000 with about 26,000 service connections. PWD's water supply consists of 60 percent surface water (from Littlerock Reservoir and the State Water Project) and 40 percent from PWD's 25 area groundwater wells. Single-family residential (SFR) customers account for 72 percent of PWD's total water usage. Remaining water usage is as follows: commercial/industrial (10 percent), multifamily residential (MFR) (9 percent), irrigation (5 percent), and construction and other customers such as schools and municipalities (4 percent).

According to RFC's report, over the preceding five years, PWD had spent more than $56 million to upgrade its water treatment plant and depleted its reserves. PWD wanted to issue $38.25 million in debt by July 2009 for future capital projects and refinancing. RFC presented policy issues for the PWD board to decide, including water budget allocation defaults and methods for calculating desired fixed revenue from proposed new rates. RFC advised the board regarding two options for determining fixed revenues: a "Cost of Service" option and a "Percentage of fixed cost" option. Advantages of the Cost of Service option were noted as "Defensible—Prop 218" and "Consistent with industry standards" but one disadvantage was "Greater revenue fluctuation with varying demand." An advantage of the alternative option was "rate stability" while disadvantages included "Significant impact on small customers who conserve water" and "weaker signal for water conservation." RFC indicated fixed revenue should not exceed 30 percent of revenues.

RFC again met with PWD's board regarding the "need to adopt a water rate increase structure for a future bond issue . . . ." It was determined PWD's new rate structure would recover 75 percent of its costs from fixed fees and 25 percent from variable fees "based on the bond team's recommendation and conservation factors. . . ." The proposed rate structure then included a fixed monthly service charge based on meter size and commodity charges based on a water budget allocation. Residential customers were provided indoor and outdoor allocations, commercial customers received a three-year average allocation and irrigation customers received only an outdoor allocation. Commodity rates were then imposed under a tiered structure, determining how much the customer went over (or stayed within) the allocated budget.

Again, RFC presented two options for determining the commodity rates and monthly service charge: the Cost of Service (COS) option and the "Fixed/Variable Cost Allocation" (FV). With the FV option, monthly fixed charges would represent 75 percent of total costs while the COS alternative would include only billing and customer service costs plus meter charges in the fixed monthly fees. RFC indicated this option offered "more revenue stability" but a "weaker conservation signal." The reverse was true for the COS option: "less revenue stability" but a "stronger conservation signal."

When RFC presented its final water rate study report to the PWD board in March 2009, the board approved the FV option but modified it such that 60 percent of fixed costs would be recovered from fixed monthly charges and 40 percent would be recovered from variable charges.

PWD prepared a "Notice of Public Hearing" pursuant to Proposition 218, and the City (and its redevelopment agency) sent letters to PWD protesting the rate increase. PWD held a public hearing in May 2009 at which City

representatives spoke against the increase and members of the public appeared to object as well. At the same meeting, the board adopted a resolution approving its 2009 bonds to replenish its reserves. "The success of this bond issue is dependent on the adoption of the pending water rate increases."

As approved, the new rate structure now imposes a fixed monthly service charge based on the size of the customer's meter and a per unit commodity charge for the commodity charge of water used, with the amount depending upon the customer's adherence to the allocated water budget. The customer pays a higher commodity charge per unit of water above the budgeted allotment, but the incremental rate increase depends on the customer's class. More particularly, all customers pay tier 1 rates ($0.64/unit in 2009) at 0 to 100 percent of their water budget allocation. Thereafter, however, the increased rate depends on the customer category:

| | SFR/MFR | Commercial | Irrigation |
| --- | --- | --- | --- |
| Tier 2 ($2.50/unit) | 100–125% | 100–130% | 0–110% |
| Tier 3 ($3.20/unit) | 125–150% | 130–160% | 110–120% |
| Tier 4 ($4.16/unit) | 150–175% | 160–190% | 120–130% |
| Tier 5 ($5.03/unit)[1] | Above 175% | Above 190% | Above 130% |

The following day, the City filed a complaint seeking to invalidate the water rate increase and the 2009 bonds. (The case was deemed related to another action filed by the City against PWD seeking injunctive and declaratory relief to stop imposition of the new rates. The cases were not consolidated.)

This action was tried in February 2010. The City sought to introduce evidence beyond the scope of the administrative record, after propounding discovery and serving Public Records Act requests for documents. The trial court granted the City's motion to amend its complaint but denied its motion to augment the record. The City filed an offer of proof identifying evidence it would have presented at trial had it been allowed to do so and requested a statement of decision. Initially, the trial court's tentative ruling was to invalidate the rate increase but after hearing oral argument and taking the matter under submission, the trial court issued its ruling validating PWD's rates and the 2009 bonds. At the court's request, both the City and PWD submitted proposed statements of decision (and the City also filed objections to PWD's statement). The court issued PWD's statement without changes. (The court mistakenly believed the City had not filed a proposed statement

---

[1] These costs per unit are the tiered rates for 2009; the per unit cost increases each year thereafter while the tier percentages remain the same.

but, when the error was brought to the court's attention, decided PWD's statement should stand.) Judgment was entered. The City appeals.

## DISCUSSION

"In November 1996, California voters adopted Proposition 218, the Right to Vote on Taxes Act. In adopting this measure, the people found and declared ' "that Proposition 13 was intended to provide effective tax relief and to require voter approval of tax increases. However, local governments have subjected taxpayers to excessive tax, assessment, fee and charge increases that not only frustrate the purposes of voter approval for tax increases, but also threaten the economic security of all Californians and the California economy itself. This measure protects taxpayers by limiting the methods by which local governments exact revenue from taxpayers without their consent." ' " (*Howard Jarvis Taxpayers Assn. v. City of Roseville* (2002) 97 Cal.App.4th 637, 640 [119 Cal.Rptr.2d 91], fns. omitted.) "Proposition 218 added articles XIII C and XIII D to the California Constitution. Article XIII C concerns voter approval for local government general taxes and special taxes. Article XIII D sets forth procedures, requirements and voter approval mechanisms for local government assessments, fees and charges. We are concerned here with article XIII D, specifically certain provisions concerning fees and charges." (*Ibid.*)

The relevant article XIII D provisions on fees and charges are as follows:

"[Section] 1. Application of article. Notwithstanding any other provision of law, the provisions of this article shall apply to all assessments, fees and charges, whether imposed pursuant to state statute or local government charter authority. . . . [¶] . . . [¶]

"[Section] 2. Definitions. As used in this article: [¶] . . . [¶]

"(e) 'Fee' or 'charge' means any levy other than an ad valorem tax, a special tax, or an assessment, imposed by an agency upon a parcel or upon a person as an incident of property ownership, *including a user fee or charge for a property-related service*. [¶] . . . [¶]

"(g) 'Property ownership' shall be deemed to include tenancies of real property where tenants are directly liable to pay the assessment, fee, or charge in question.

"(h) 'Property-related service' means a public service having a direct relationship to property ownership. [¶] . . . [¶]

"[Section] 3. Limitation of property taxes, assessments, fees and charges[.]

"(a) No tax, assessment, fee, or charge shall be assessed by any agency upon any parcel of property or upon any person as an incident of property ownership except:

"(1) The ad valorem property tax imposed pursuant to Article XIII and Article XIII A.

"(2) Any special tax receiving a two-thirds vote pursuant to Section 4 of Article XIII A.

"(3) Assessments as provided by this article.

"(4) *Fees or charges for property related services as provided by this article.*

"(b) For purposes of this article, fees for the provision of electrical or gas service shall not be deemed charges or fees imposed as an incident of property ownership.[2] [¶] . . . [¶]

"[Section] 6. Property Related Fees and Charges.

"(a) Procedures for New or Increased Fees and Charges. An agency shall follow the procedures pursuant to this section in imposing or increasing any fee or charge as defined pursuant to this article [(these procedures include notice to property owners, and a public hearing for proposed new or increased fees)]: [¶] . . . [¶]

"(b) *Requirements for Existing, New or Increased Fees and Charges.* A fee or charge shall not be extended, imposed, or increased by any agency unless it meets *all* of the following requirements:

"(1) Revenues derived from the fee or charge *shall not exceed the funds required to provide* the property-related service.

"(2) Revenues derived from the fee or charge *shall not be used for any purpose other* than that for which the fee or charge was imposed.

"(3) The amount of a fee or charge imposed upon any parcel or person as an incident of property ownership *shall not exceed the proportional cost of the service attributable to the parcel.*

---

[2] Article XIII D, section 4 sets forth procedures and requirements for assessments analogous to the procedures and requirements for fees and charges set forth in article XIII D, section 6, *post.* Article XIII D, section 5 specifies the effective date and exemptions from section 4.

"(4) No fee or charge may be imposed for a service unless that service is actually used by, or immediately available to, the owner of the property in question. Fees or charges based on potential or future use of a service are not permitted. Standby charges, whether characterized as charges or assessments, shall be classified as assessments and shall not be imposed without compliance with Section 4.

"(5) No fee or charge may be imposed for general governmental services including, but not limited to, police, fire, ambulance or library services, where the service is available to the public at large in substantially the same manner as it is to property owners. [¶] Reliance by an agency on any parcel map, including, but not limited to, an assessor's parcel map, may be considered a significant factor in determining whether a fee or charge is imposed as an incident of property ownership for purposes of this article. *In any legal action contesting the validity of a fee or charge, the burden shall be on the agency to demonstrate compliance with this article.*

"(c) Voter Approval for New or Increased Fees and Charges. Except for fees or charges for sewer, water, and refuse collection services, no property-related fee or charge shall be imposed or increased unless and until that fee or charge is submitted and approved by a majority vote of the property owners of the property subject to the fee or charge or, at the option of the agency, by a two-thirds vote of the electorate residing in the affected area. The election shall be conducted not less than 45 days after the public hearing. . . .

"(d) Beginning July 1, 1997, all fees or charges shall comply with this section." (Italics added.)

 As our Supreme Court emphasized in *Silicon Valley Taxpayers' Assn., Inc. v. Santa Clara County Open Space Authority, supra*, 44 Cal.4th 431, "We ' " 'must enforce the provisions of our Constitution and "may not lightly disregard or blink at . . . a clear constitutional mandate." ' " ' [Citation.] In so doing, we are obligated to construe constitutional amendments in a manner that effectuates the voters' purpose in adopting the law. [Citation.]" (*Id.* at p. 448.) "Because Proposition 218's underlying purpose was to limit government's power to exact revenue and to curtail the deference that had been traditionally accorded legislative enactments on fees, assessments, and charges, a more rigorous standard of review is warranted," and we must exercise our "independent judgment" in determining whether PWD's rate increase violates article XIII D (Prop. 218). (44 Cal.4th at p. 448.)

Among other substantive challenges, the City argues PWD failed to demonstrate that its water rates are proportional to the cost of providing water service to each parcel as required under section 6, subdivision (b), paragraph

(3) of article XIII D: "The Proposition 218 Ballot Pamphlet makes clear that the voters intended that 'No property owner's fee may be more than the cost to provide service to that property owner's land.' " Nevertheless, the City says, PWD's rates violate this proportionality requirement in a number of respects: (1) for no permissible purpose (according to the City), PWD admittedly targets irrigation users to pay dramatically higher and disproportionate water rates; (2) PWD's monthly service charge is arbitrary and not tied to the actual costs of providing identified services to each meter; (3) PWD's commodity charge tiers are not proportional to the costs of providing water service; and (4) PWD's water budget structure is not proportional to the costs of providing water service and fails to achieve its stated purpose. Moreover, the City urges, PWD failed to prove its revenues under the new rate structure will not exceed the costs of providing water service in contravention of article XIII D, section 6, subdivision (b), paragraph (1), and instead "all but assures that revenues PWD receives from customers in the higher tiers will be more than is required to cover PWD's costs of service." Further, the City says, PWD's new rates require irrigation users to pay for services they cannot receive in violation of section 6, subdivision (b), paragraph (4) of article XIII D.

According to the City, "PWD's scheme charges a few irrigation users a vastly disproportionate share of PWD's total costs. PWD makes no showing whatsoever that PWD's cost of delivering service to those irrigation users is proportionately higher than PWD's costs of delivering service to residential and commercial users. The record shows that PWD intentionally seeks to recoup most of its costs from a relatively few irrigation users (who happen to be institutions such as the City), so as to keep costs to the vast majority of PWD's customers proportionately low. This sort of price discrimination is not allowed under Proposition 218 . . . ."

In response, PWD asserts that the structuring of the various tiers does not even constitute a "fee or charge" for purposes of Proposition 218 but merely "defined percentages of a customer's water budget that define the breaking points for the applicable tiers," but this is inconsistent with the law as PWD uses these tiers to calculate its customers' water rates. "Because it is imposed for the property-related service of water delivery, [PWD's] water rate, as well as its fixed monthly charges, are fees or charges within the meaning of article XIII D . . . ." (*Bighorn-Desert View Water Agency v. Verjil* (2006) 39 Cal.4th 205, 217 [46 Cal.Rptr.3d 73, 138 P.3d 220].) "[A]ll charges for water delivery" incurred after a water connection is made "are charges for a property-related service, whether the charge is calculated on the basis of consumption or is imposed as a fixed monthly fee." (*Ibid.*)

Next, PWD says it is entitled to promote conservation in such a manner pursuant to article X, section 2, of the California Constitution: "It is hereby

declared that because of the conditions prevailing in this State the general welfare requires that the water resources of the State be put to beneficial use to the fullest extent of which they are capable, and that the waste or unreasonable use or unreasonable method of use of water be prevented, and that the conservation of such waters is to be exercised with a view to the reasonable and beneficial use thereof in the interest of the people and for the public welfare. The right to water or to the use or flow of water in or from any natural stream or water course in this State is and shall be limited to such water as shall be reasonably required for the beneficial use to be served, and such right does not and shall not extend to the waste or unreasonable use or unreasonable method of use or unreasonable method of diversion of water. . . . This section shall be self-executing, and the Legislature may also enact laws in the furtherance of the policy in this section contained."

In addition, PWD notes, consistent with this constitutional provision, the Legislature enacted Water Code section 372 (allocation-based conservation water pricing) which provides:

"(a) A public entity may employ allocation-based conservation water pricing that meets all of the following criteria:

"(1) Billing is based on metered water use.

"(2) A basic use allocation is established for each customer account that provides a reasonable amount of water for the customer's needs and property characteristics. Factors used to determine the basic use allocation may include, but are not limited to, the number of occupants, the type or classification of use, the size of lot or irrigated area, and the local climate data for the billing period. Nothing in this chapter prohibits a customer of the public entity from challenging whether the basic use allocation established for that customer's account is reasonable under the circumstances. Nothing in this chapter is intended to permit public entities to limit the use of property through the establishment of a basic use allocation.

"(3) A basic charge is imposed for all water used within the customer's basic use allocation, except that at the option of the public entity, a lower rate may be applied to any portion of the basic use allocation that the public entity has determined to represent superior or more than reasonable conservation efforts.

"(4) A conservation charge shall be imposed on all increments of water use in excess of the basic use allocation. The increments may be fixed or may be determined on a percentage or any other basis, without limitation on the number of increments, or any requirement that the increments or conservation

charges be sized, or ascend uniformly, or in a specified relationship. The volumetric prices for the lowest through the highest priced increments shall be established in an ascending relationship that is economically structured to encourage conservation and reduce the inefficient use of water, consistent with Section 2 of Article X of the California Constitution.

"(b)(1) Except as specified in subdivision (a), the design of an allocation-based conservation pricing rate structure shall be determined in the discretion of the public entity.

"(2) The public entity may impose meter charges or other fixed charges to recover fixed costs of water service in addition to the allocation-based conservation pricing rate structure.

"(c) A public entity may use one or more allocation-based conservation water pricing structures for any class of municipal or other service that the public entity provides." (Wat. Code, § 372.)

▇ While this statute contemplates allocation-based conservation pricing consistent with California Constitution, article X, section 2, PWD fails to explain why this provision cannot be harmonized with Proposition 218 and its mandate for proportionality. PWD fails to identify any support in the record for the inequality *between* tiers, depending on the category of user.

▇ In addition, PWD says, "the distinct tiers for irrigation users are [further] supported by Water Code section 106, which expressly recognizes that the use of water for domestic purposes is superior to that for irrigation usage." However, the precise language of section 106 is as follows: "It is hereby declared to be the established policy of this State that the use of water for domestic purposes is the highest use of water and that the *next highest use* is for irrigation." (Wat. Code, § 106, italics added; and see *Deetz v. Carter* (1965) 232 Cal.App.2d 851, 854, 856 [43 Cal.Rptr. 321] [domestic use includes " 'consumption for the sustenance of human beings, for household conveniences, and for the care of livestock,' " but not "commercial purposes"].) Yet, under PWD's tier structure, commercial users are permitted to use amounts of water exceeding their budgeted allocation under tier 1 at a lower cost than irrigation only users—without any explanation for this disparity even attempted by PWD.

California Constitution, article X, section 2 is not at odds with article XIII D so long as, for example, conservation is attained in a manner that "shall not

exceed the proportional cost of the service attributable to the parcel." (Art. XIII D, § 6, subd. (b), par. (3).) According to the record, the efficient use of water in keeping with the policy in favor of water conservation is already built into the customer's budgeted allocation (the tier 1 rate, which is equal for all users). Yet, a review of the tier structure alone establishes that irrigation customers such as the City are charged disproportionate rates reaching tier 5 ($5.03/unit) rates at 130 percent of their budgeted allocation as compared to other users who do not reach such high rates until they exceed 175 percent (SFR/MFR) or 190 percent (commercial) without any showing by PWD of a corresponding disparity in the cost of providing water to these customers at such levels.[3] Notably, PWD's "IRR" category means customers designated as "irrigation *only*" users; PWD does not segregate the recognized outdoor and irrigation usage of its other customers such as residential or commercial users. As a result, a residential (single- or multifamily) or commercial user (constrained only by its historical three-year average usage) could waste or inefficiently use water by, for example, filling, emptying and refilling a swimming pool or excessively hosing off a worksite or parking lot without the same proportional cost because of the significant disparity in tiered rates for water use in excess of the customer's allotted water budget. According to the record, it is the irrigation-only user (perhaps, as the City urges, maintaining playing fields, playgrounds and parks for example) who is "potentially the most impacted," without a corresponding showing in the record that such impact is justified under California Constitution, article X, section 2, or permissible under article XIII D, section 6.

As stated in section 6, subdivision (b), paragraph (5) of article XIII D, "In any legal action contesting the validity of a fee or charge, the burden shall be on the agency to demonstrate compliance with this article." According to RFC, it was the cost of service (COS) option—the option PWD did *not* choose—that was "[d]efensible [under] Prop[osition] 218," and this option was also "[c]onsistent with industry standards," but it meant "[g]reater revenue fluctuation with varying demand." On the other hand, RFC advised PWD the "[p]ercentage of fixed cost" or FV option it ultimately chose would send a "*weaker* signal for water conservation" and would mean a "[s]ignificant impact on small customers *who conserve* water," but afforded "rate

---

[3]

| | SFR/MFR | Commercial | Irrigation |
|---|---|---|---|
| Tier 2 ($2.50/unit) | 100–125% | 100–130% | 0–110% |
| Tier 3 ($3.20/unit) | 125–150% | 130–160% | 110–120% |
| Tier 4 ($4.16/unit) | 150–175% | 160–190% | 120–130% |
| Tier 5 ($5.03/unit) | Above 175% | Above 190% | Above 130% |

stability." (Italics added.) It follows that PWD has failed to carry its burden to demonstrate compliance with the requirements of article XIII D, and the judgment must be reversed.[4]

## DISPOSITION

The judgment is reversed. The City is entitled to its costs of appeal.

Perluss, P. J., and Zelon, J., concurred.

On August 25, 2011, the opinion was modified to read as printed above.

---

[4] In addition to arguing PWD's rate structure violated the proportionality requirement of Proposition 218, the City says the trial court abused its discretion in denying its motion to augment (beyond the administrative record) and raises a number of additional substantive and procedural challenges, but we need not address these additional arguments in light of our disposition of the preceding issue.