Filed 10/15/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| HAROLD GRIFFITH,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>PAJARO VALLEY WATER<br>MANAGEMENT AGENCY,<br><br>    Defendant and Respondent. | H038087<br>(Santa Cruz County<br>Super. Ct. Nos. CV168936, CV168080) |
| JOSEPH P. PENDRY et al.,<br><br>    Plaintiffs and Appellants,<br><br>    v.<br><br>PAJARO VALLEY WATER<br>MANAGEMENT AGENCY,<br><br>    Defendant and Respondent. | H038264<br>(Santa Cruz County<br>Super. Ct. Nos. CV168936, CV168080) |

After defendant Pajaro Valley Water Management Agency enacted ordinance No. 2010-02 that increased groundwater augmentation charges for the operation of wells within defendant's jurisdiction, plaintiff Harold Griffith challenged the ordinance on the grounds that the increase (1) was procedurally flawed because it was not approved in an election required by Proposition 218 (Cal. Const., art. XIII D, § 6),[1] (2) did not conform to certain substantive requirements of Proposition 218, and (3) was to be used for a

---

[1] Further unspecified section references are to the California Constitution, article XIII D.

purpose not authorized by the law under which defendant was formed. Thereafter, plaintiffs Joseph Pendry, James Spain, Yuet-Ming Chu, William J. McGrath, and Henry Schepeler (Pendry) challenged the ordinance on similar grounds and on the ground that it was void because one of the directors who voted for the ordinance had a disqualifying conflict of interest within the meaning of the Political Reform Act (PRA) (Gov. Code, § 87100 et seq.).[2] They also challenged an ordinance passed in 2002, which imposed an augmentation charge, and a 1993 management-fee ordinance. The trial court rendered judgments for defendant. Plaintiffs have appealed and reiterate their challenges. We are considering the two appeals together for purposes of briefing, oral argument, and disposition. After conducting an independent review of the record (*Silicon Valley Taxpayers Assn.*, *Inc*. *v*. *Santa Clara County Open Space Authority* (2008) 44 Cal.4th 431, 448 (*Silicon Valley*)), we affirm the judgments.

GENERAL BACKGROUND

We have previously detailed an historical background to this case in *Pajaro Valley Water Management Agency v*. *Amrhein* (2007) 150 Cal.App.4th 1364, 1370-1375 (*Amrhein*). We therefore decline to repeat it and will instead begin with the trial court's succinct summary.

"The Pajaro Valley Groundwater Basin supplies most of the water used in the Pajaro Valley. The water is being extracted faster than it is being replenished by natural forces, which leads to saltwater intrusion, especially near the coast. Once the water table drops below sea level, seawater seeps into the groundwater basin. [Defendant] was created [in 1984 by the Pajaro Valley Water Management Agency Act (Stats. 1984, ch. 257, § 1 et seq., p. 798 et seq., Deering's Wat.--Uncod. Acts (2008) Act 760, p. 681 (Act))] to deal with this issue. At present, the strategy is to use recycled wastewater, supplemental wells, captured storm runoff, and a coastal distribution system. The

_____

[2] Plaintiffs also asserted other grounds that they do not advance on appeal.

2

purpose is to reduce the amount of water taken from the groundwater basin (for example, the amount taken from wells), by supplying water to some [coastal] users. The cost of this process is borne by all users, on the theory that even those taking water from [inland] wells benefit from the delivery of water to [coastal users], as that reduces the amount of groundwater those [coastal users] will extract [from their own wells], thereby keeping the water in [all] wells from becoming too salty."

Ordinance No. 2010-02 describes "three supplemental water projects that work together to provide supplemental water to reduce overdraft, retard seawater intrusion, and improve and protect the groundwater basin supply: (1) Watsonville Recycled Water Project, which provides tertiary treated recycled water for agricultural use and includes inland wells that are used to provide cleaner well water that is blended with the treated water in order to improve the water quality so that it may be used for agricultural purposes; (2) Harkins Slough Project, which diverts excess wet-weather flows from Harkins Slough to a basin that recharges the groundwater, which then is available to be extracted and delivered for agricultural use; and (3) Coastal Distribution System ('CDS'), which consists of pipelines that deliver the blended recycled water and Harkins Slough Project water for agricultural use along the coast."

"The Act specifically empowers [defendant] to adopt ordinances levying 'groundwater augmentation charges on the extraction of groundwater from all extraction facilities within the agency for the purposes of paying the costs of purchasing, capturing, storing, and distributing supplemental water for use within [defendant's] boundaries.' " (*Amrhein*, *supra*, 150 Cal.App.4th at p. 1372; see Act, § 1001.)

Ordinance No. 2010-02 describes that the augmentation charge is necessary to cover the costs of "supplemental water service" described as follows: "(a) the purchase/acquisition, capture, storage and distribution of supplemental water through the supplemental water projects [Watsonville Recycled Water Project; Harkins Slough Project; CDS] and including the planning, design, financing, construction, operation,

3

maintenance, repair, replacement and management of these project facilities, and (b) basin management monitoring and planning to manage the existing projects and to identify and determine future water projects that would further reduce groundwater overdraft and retard seawater intrusion. The cost of the service also includes ongoing debt payments related to the design and construction of the completed supplemental water projects."

PROCEDURAL BACKGROUND

In 2002, defendant approved ordinance No. 2002-02, which established an augmentation charge of $80 per acre-foot. Several citizens challenged the ordinance on the ground that the approval procedure did not comply with the notice, hearing, and voting requirements of Proposition 218. The trial court dismissed the case on the ground of a special statute of limitations, and the plaintiffs appealed to this court. We reversed the judgment after finding that part of the augmentation charge was not subject to the statute of limitations. (*Scurich v. Pajaro Valley Water Management Agency* (May 27, 2004, H025776) [nonpub. opn.] (*Scurich*); see *Eiskamp v. Pajaro Valley Water Management Agency* (2012) 203 Cal.App.4th 97, 100-101 (*Eiskamp*).) We remanded the case for trial.

In 2003, defendant approved ordinance No. 2003-01, which increased the augmentation charge to $120 per acre-foot. It did not comply with the notice, hearing, and voting requirements of Proposition 218. But it filed *Amrhein* as a validation proceeding[3] seeking a declaration as to the validity of the ordinance. The trial court declared the ordinance valid, and citizens who had objected appealed to this court.

In 2004, defendant approved ordinance No. 2004-02, which increased the augmentation charge to $160 per acre-foot. It did not comply with the notice, hearing,

---

[3] In rem proceeding by public agency against all persons interested in validity of matter determined. (Code Civ. Proc., § 860 et seq.)

4

and voting requirements of Proposition 218. Griffith challenged the ordinance and a 1993 management-fee ordinance. San Andreas Mutual Water Company and others also challenged the ordinance. The two actions were consolidated with *Scurich* (Consolidated Lawsuits) and the Consolidated Lawsuits were stayed pending our decision in *Amrhein*.

In May 2007, we reversed the judgment in *Amrhein* after holding that "the augmentation fee is a fee or charge 'imposed . . . as an incident of property ownership' and thus subject to [the Proposition 218] preconditions for the imposition of such charges." (*Amrhein*, *supra*, 150 Cal.App.4th at p. 1370.)

In October 2007, defendant repealed ordinance Nos. 2003-01 and 2004-02.

"In January 2008, the Scurich plaintiffs, the San Andreas plaintiffs, Harold Griffith, and the Amrhein defendants wanted to resolve all disputes in the Amrhein Lawsuit and the Consolidated Lawsuits. They and [defendant] then entered into a stipulated agreement for entry of judgment (stipulated agreement). The stipulated agreement provided: 'all matters raised in the Consolidated Lawsuits and the Amrhein Lawsuit (collectively the "Pending Litigation") as to [defendant's] actions shall be resolved by entry of judgment in the Pending Litigation'; [defendant] would pay $1.8 million to the Scurich plaintiffs, the San Andreas plaintiffs, Harold Griffith, and the Amrhein defendants for legal fees, costs, and expenses; and the augmentation charges collected pursuant to ordinance Nos. 2003-01 and 2004-02 would be refunded. It also stated that the 'settlement extinguishes any and all claims arising out of the Pending Litigation all issues, transactions and/or related claims or actions including all claims that the parties have made or could have made with respect to the validity of any Augmentation Charge or Management Fee ordinances currently in effect . . . .' The stipulated agreement did not provide for either the repeal of [ordinance No. 2002-02] or the refund of augmentation charges imposed under [that] Ordinance.

"In February 2008, judgment was entered pursuant to the terms of the stipulated agreement." (*Eiskamp*, *supra*, 203 Cal.App.4th at p. 102.)

5

In May 2010, defendant mailed notice of a public hearing on a proposed three-tier augmentation charge increase to all parcel owners.[4] At the hearing, defendant tallied 291 written protests from 1,930 eligible parcel owners. Defendant then enacted ordinance No. 2010-02, which imposed the increased augmentation charges.

In June 2010, defendant began an all-mail election on the ordinance. It mailed ballots to all owners of land parcels served by a well who would be subject to the augmentation charge. Each ballot was accorded weighted votes proportional to the parcel's financial obligation as measured by average annual water use over the prior five years. And each ballot stated its number of votes. The weighted votes approved the ordinance 72 percent to 28 percent. But, if counted one vote per parcel, 324 votes were in favor of the ordinance and 608 votes were against the ordinance.[5] Plaintiffs then filed the instant actions to challenge ordinance No. 2010-02.

CHALLENGES TO ORDINANCE NO. 2010-02

"Proposition 218 was passed in 1996 by the electorate to plug certain perceived loopholes in Proposition 13. [Citations.] Specifically, by increasing assessments, fees, and charges, local governments tried to raise revenues without triggering the voter approval requirements in Proposition 13." (*Silicon Valley Taxpayers' Assn. v. Garner* (2013) 216 Cal.App.4th 402, 405-406.)

Relevant here is the component of Proposition 218 that undertakes to constrain the imposition by local governments of "assessments, fees and charges." (§ 1.)

---

[4] Defendant proposed $195 per acre-foot for metered wells inside the coastal delivered-water zone, $162 per acre-foot for metered wells outside the delivered-water zone (primarily municipal, industrial, and agricultural users), and $156 per acre-foot for unmetered wells (primarily rural residential). It also proposed $306 per acre-foot for delivered water charges.

[5] The parties differ immaterially on the one-for-one vote count.

6

Proposition 218 restricts "the power of public agencies to impose a ' "[f]ee" or "charge," ' defined as any 'levy other than an ad valorem tax, a special tax, or an assessment, imposed by an agency upon a parcel or *upon a person as an incident of property ownership*, including a user fee or charge for a property related service.' [Citation.] The phrase '[p]roperty-related service' is defined to mean 'a public service having a direct relationship to property ownership.' [Citation.] 'Property ownership' is defined to 'include tenancies of real property where tenants are directly liable to pay the assessment, fee, or charge in question.' [Citation.]

"Where a proposed fee or charge comes within this definition, [Proposition 218] requires the proposing agency to identify parcels upon which it will be imposed, and to conduct a public hearing. [Citation.] The hearing must be preceded by written notice to affected owners setting forth, among other things, a 'calculat[ion]' of '[t]he amount of the fee or charge proposed to be imposed upon each parcel . . . .' [Citation.] If a majority of affected owners file written protests at the public hearing, 'the agency shall not impose the fee or charge.' [Citation.] Moreover, unless the charge is for 'sewer, water, [or] refuse collection services,' 'no property related fee or charge shall be imposed or increased unless and [it] is submitted and approved by a majority vote of the property owners of the property subject to the fee or charge or, at the option of the agency, by a two-thirds vote of the electorate residing in the affected area.' " (*Amrhein*, *supra*, 150 Cal.App.4th at pp. 1384-1385.)

As mentioned, we have determined that a groundwater augmentation charge such as the one imposed by ordinance No. 2010-02 "is indeed imposed as an incident of property ownership [and] that it is subject to the restrictions imposed on such charges by [Proposition 218]." (*Amrhein*, *supra*, 150 Cal.App.4th at p. 1393.) We cautioned in *Amrhein*, however, that "We should not be understood to imply that the charge is necessarily subject to *all* of the restrictions imposed by [Proposition 218] on charges incidental to property ownership. [*Amrhein*] presents no occasion to determine whether

7

this or a similar charge may fall within any of the express exemptions or partial exemptions set forth in that measure." (*Ibid*. & fn. 21.)

This case, however, presents such an occasion.

Boiled to its essence, plaintiffs' challenge to the election is that the weighted vote was improper. But the challenge necessarily fails if the augmentation charge falls within the express exemption set forth in Proposition 218 for sewer, water, and refuse collection services. (§ 6, subd. (c) [vote required to impose or increase property-related fee "Except for . . . sewer, water, and refuse collection services."].)[6]

Plaintiffs argue that defendant does not provide "water service" as that term is commonly understood. (See *Howard Jarvis Taxpayers Assn. v. City of Salinas* (2002) 98 Cal.App.4th 1351, 1358 ["The average voter would envision 'water service' as the supply of water for personal, household, and commercial use . . . ."] (*Salinas*).) They urge that defendant provides " 'groundwater management,' " which may be a service "but that service is not 'water service.' " Plaintiffs, however, make a distinction without a difference.

Domestic water delivery through a pipeline is a property-related water service within the meaning of Proposition 218. (*Bighorn-Desert View Water Agency v. Verjil* (2006) 39 Cal.4th 205, 217.) And we have held that, for purposes of Proposition 218, the augmentation charge at issue here does not differ materially "from a charge on *delivered* water." (*Amrhein*, *supra*, 150 Cal.App.4th at pp. 1388-1389.) If the charges for water delivery and water extraction are akin, then the services behind the charges are akin. Moreover, the Legislature has endorsed the view that water service means more than just supplying water. The Proposition 218 Omnibus Implementation Act, enacted specifically

---

[6] According to defendant, the election was unnecessary but held nevertheless in an abundance of caution "because no case has explicitly reached the issue, and because of the near certainty of suit."

to construe Proposition 218, defines "water" as "any system of public improvements intended to provide for the production, storage, supply, treatment, or distribution of water." (Gov. Code, § 53750, subd. (m).) Thus, the entity who produces, stores, supplies, treats, or distributes water necessarily provides water service. Defendant's statutory mandate to purchase, capture, store, and distribute supplemental water therefore describes water service.

Plaintiffs' reliance on *Salinas* is erroneous. In *Salinas*, the question was whether a storm drainage fee was exempt from the voter-approval requirement because it was a water or sewer service fee. Our point about the average voter envisioning water service as meaning the supplying of water was a preface to distinguishing water service from storm drainage rather than a definition of water service. The entire sentence reads "The average voter would envision 'water service' as the supply of water for personal, household, and commercial use, not a system or program that monitors storm water for pollutants, carries it away [from property], and discharges it into the nearby creeks, river and ocean." (*Salinas*, *supra*, 98 Cal.App.4th at p. 1358.)

We therefore conclude that the augmentation charge at issue here is for water service within the meaning of Proposition 218. As such, it was expressly exempt from the fee/charge voting requirement.

In a second procedural attack, Pendry urges that defendant transgressed Proposition 218 by enacting ordinance No. 2010-02 without giving notice of the protest hearing to tenants and public utility customers who indirectly pay the augmentation charge. There is no merit to the claim.

"An agency shall follow the procedures pursuant to this section in imposing or increasing any fee or charge as defined pursuant to this article, including, but not limited to, the following: [¶] (1) The parcels upon which a fee or charge is proposed for imposition shall be identified. The amount of the fee or charge proposed to be imposed upon each parcel shall be calculated. *The agency shall provide written notice by mail of*

9

*the proposed fee or charge to the record owner of each identified parcel* upon which the fee or charge is proposed for imposition, the amount of the fee or charge proposed to be imposed upon each, the basis upon which the amount of the proposed fee or charge was calculated, the reason for the fee or charge, together with the date, time, and location of a public hearing on the proposed fee or charge." (§ 6, subd. (a)(1), italics added.)

In short, Proposition 218 requires that notice of the protest hearing be sent to record owners, not tenants or customers. (See Gov. Code, § 53750, subd. (j) ["For purposes of . . . Article XIII D of the California Constitution . . . [¶] . . . [¶] (j) 'Record owner' means the owner of a parcel whose name and address appears on the last equalized secured property tax assessment roll, or in the case of any public entity, the State of California, or the United States, means the representative of that public entity at the address of that entity known to the agency."].)

It is true, as Pendry points out, that, in the definitions section of Proposition 218, the term "property ownership" is defined to include "tenancies of real property where tenants are directly liable to pay the assessment, fee, or charge in question." (§ 2, subd. (g).) And it is true that "when a well [is] shown to be operated by a lessee or other occupant, that person could be billed." (*Amrhein*, *supra*, 150 Cal.App.4th at p. 1383.) But the notice provision of section 6, subdivision (a), requires notice to record owners, not to those having property ownership. (*Silicon Valley*, *supra*, 44 Cal.4th at p. 444 [" 'The principles of constitutional interpretation are similar to those governing statutory construction.' [Citation.] If the language is clear and unambiguous, the plain meaning governs."].)

"Proposition 218 also imposes substantive limitations, including restrictions on the use of revenues derived from such charges." (*Amrhein*, *supra*, 150 Cal.App.4th at p. 1385.)

"A fee or charge shall not be extended, imposed, or increased by any agency unless it meets all of the following requirements:

10

"(1) Revenues derived from the fee or charge shall not exceed the funds required to provide the property related service.

"(2) Revenues derived from the fee or charge shall not be used for any purpose other than that for which the fee or charge was imposed.

"(3) The amount of a fee or charge imposed upon any parcel or person as an incident of property ownership shall not exceed the proportional cost of the service attributable to the parcel.

"(4) No fee or charge may be imposed for a service unless that service is actually used by, or immediately available to, the owner of the property in question.  Fees or charges based on potential or future use of a service are not permitted.  Standby charges, whether characterized as charges or assessments, shall be classified as assessments and shall not be imposed without compliance with Section 4 [procedures and requirements for proposed assessments].

"(5) No fee or charge may be imposed for general governmental services . . . where the service is available to the public at large in substantially the same manner as it is to property owners. . . .  In any legal action contesting the validity of a fee or charge, the burden shall be on the agency to demonstrate compliance with this article."  (§ 6, subd. (b).)

Plaintiffs argue that the augmentation charge transgresses each of the section 6, subdivision (b), substantive limitations.

Revenues shall not exceed the funds required to provide the property related service

According to Griffith,[7] the revenues derived from the augmentation charge exceed the funds required to provide supplemental water service because some of the revenue is

_____

[7] Pendry does not challenge compliance with section 6, subdivision (b)(1).

11

used to pay ongoing debt that was "incurred to build a now <u>abandoned pipeline</u> to bring water into the Valley."[8] There is no merit to the point.

As noted above, the Act allows defendant to levy groundwater augmentation charges for the purposes of paying the costs of purchasing, capturing, storing, and distributing supplemental water. Such costs necessarily include debt service incurred to construct facilities to capture, store, and distribute supplemental water.

<u>Revenues shall not be used for any purpose other than that for which the fee or charge was imposed</u>

According to plaintiffs, the revenues derived from the augmentation charge are used for a purpose other than that for which the charge was imposed because some of the revenue is used to pay debt service and defendant's general expenses. Again, the Act allows an augmentation charge to cover debt service. And similar reasoning supports that the costs of purchasing, capturing, storing, and distributing supplemental water necessarily include general expenses to administer the purchasing, capturing, storing, and distributing of supplemental water.

Pendry, however, expands on this theme in a separate, detailed argument to the effect that the augmentation charge is unauthorized by the Act. He contends that ordinance No. 2010-02 is invalid because it allows the augmentation charge to be used for "supplemental water service," a purpose not authorized by the Act. Without specifically referring to the Watsonville Recycled Water Project that blends treated recycled water with well water for agricultural use, he complains that defendant "is using the funds generated by the augmentation charge imposed by Ordinance 2010-02 to extract groundwater from within the watershed and deliver that water to the coast . . . ."

_____

[8] Defendant's Proposition 218 Service Charge Report (Rate Study), in evidence below, explains that a previously recommended import pipeline was no longer feasible "[d]ue to changes in the availability of Central Valley Project water supplies."

12

Pendry relies on the Act, which authorizes defendant to levy augmentation charges to pay the costs of purchasing, capturing, storing, and distributing supplemental water for use within the boundaries of the agency.  From there, Pendry notes that the Act states that " 'Supplemental water' means surface water or groundwater imported from outside the watershed or watersheds of the groundwater basin, flood waters that are conserved and saved within the watershed or watersheds which would otherwise have been lost or would not have reached the groundwater basin, and recycled water."  (Act, § 316.)  From this, Pendry concludes that the recycle/well blend is not supplemental water because the well portion of the blend is neither imported water, flood water, nor recycled water.  We disagree with Pendry's analysis.

Defendant's Rate Study (*ante*, fn. 8) explains that "The [Watsonville Recycled Water Facility] produces recycled water with salinity (Total Dissolved Solids or TDS concentration) between approximately 700 and 900 mg/L.  The concentration of TDS varies seasonally as a result of the source water flowing into the Waste Water Treatment Plant.  In order to reduce salinity and use the recycled water for irrigation purposes, the recycled water must be blended with higher quality (lower TDS) water.  Therefore, the recycled water project includes the construction, operation, and maintenance of blend water from supplemental groundwater wells.  The supplemental wells are described in the BMP [Basin Management Plan] as part of the recycled water project.  The wells are a necessary component of the recycled water project, which reduces coastal pumping and thus increases the sustainable yield of the overall groundwater basin.  These wells also off-set and reduce the adverse water quality wells located closer to the coast."

" 'Recycled water' means water which, as a result of treatment of waste, is suitable for a direct beneficial use or a controlled use that would not otherwise occur and is therefor considered a valuable resource."  (Wat. Code, § 13050, subd. (n).)

Given this definition, it is apparent that the Watsonville Recycled Water Facility does not produce recycled water because the water it produces is not suitable for the

13

beneficial use of coastal agriculture.[9] The water only becomes recycled water when blended with the well water. Thus, the recycle/well blend water delivered to the coast is supplemental water.

We are constrained to add that the Act unquestionably allows defendant to extract groundwater for the purpose of capturing recycled water. The Act generally provides that defendant "should, in an efficient and economically feasible manner, utilize supplemental water and available underground storage and should manage the groundwater supplies to meet the future needs of the basin." (Act, § 102, subd. (g).) It specifically provides that defendant, "in order to improve and protect the quality of water supplies may treat, inject, extract, or otherwise control water, including, but not limited to, control of extractions, and construction of wells and drainage facilities." (*Id*. § 711.) And it also provides that defendant "shall have the power to take all affirmative steps necessary to replenish and augment the water supply within its territory." (*Id*. § 714.)

<u>The amount imposed as an incident of property ownership shall not exceed the proportional cost of the service attributable to the parcel</u>

According to Griffith, the amount imposed on his parcel was disproportionate because he uses no services. But this overlooks that "the management of the water resources . . . for agricultural, municipal, industrial, and other beneficial uses is in the public interest" and defendant was created to manage the resources "for the common benefit of all water users." (Act, § 101.) It also overlooks that the augmentation charge pays for "the activities required to prepare or implement any groundwater management program." (*Id*. § 1002, subd. (a).)

---

[9] "Agricultural uses shall have priority over other uses under this act within the constraints of state law." (Act, § 102, subd. (d).)

14

Pendry similarly grounds his argument on the erroneous premise that "The only property owners receiving § 6(b) services from [defendant] are the coastal landowners receiving delivered water."

Pendry specifically complains that defendant "established the augmentation charge by calculating the amount needed for its project, and then subtracting its sources of revenue other than the augmentation charge, with the remainder being the amount of the augmentation charge." He urges that defendant improperly "worked backwards." According to Pendry, "the proportional cost of service must be calculated . . . before setting the rate for the augmentation charge."

Defendant indeed established its augmentation charge based on a revenue-requirement model that budgeted the rates by (1) taking the total costs of chargeable activities, (2) deducting the revenue expected from other sources, and (3) apportioning the revenue requirement among the users. The American Water Works Association Manual of Water Supply Practices, in evidence below and relied on by defendant's rate-making consultant, recommends this methodology ("The total annual cost of providing water service is the annual revenue requirements that apply to the particular utility"). Pendry does not explain why this approach offends Proposition 218 proportionality. He cites *Silicon Valley*, *supra*, 44 Cal.4th at page 457 (" 'an assessment calculation that works backward by starting with an amount taxpayers are likely to pay, and then determines an annual spending budget based thereon, does not comply with the law governing assessments.' "). Unlike *Silicon Valley*, however, this case neither involves an assessment nor a what-will-the-market-bear methodology. Pendry also cites *Howard Jarvis Taxpayers Assn. v. City of Fresno* (2005) 127 Cal.App.4th 914, 923. But that case says nothing more than that costs should be determined and apportioned ("Together, subdivision (b)(1) and (3) of article XIII D, section 6, makes it necessary--if Fresno wishes to recover all of its utilities costs from user fees--that it reasonably determine

15

[citation] the unbudgeted costs of utilities enterprises and that those costs be recovered through rates proportional to the cost of providing service to each parcel.").  (*Ibid*.)

Pendry acknowledges that defendant apportioned the augmentation charge among different categories of users (metered wells, unmetered wells, wells within the delivered water zone).  But he argues that *City of Palmdale v. Palmdale Water Dist.* (2011) 198 Cal.App.4th 926 (*Palmdale*), holds that Proposition 218 proportionality compels a parcel-by-parcel proportionality analysis.  We disagree with Pendry.

In *Palmdale*, the court reversed a judgment that had upheld tiered categories of water rates.  It held that the water district had failed to carry its burden to justify disparate treatment of the customer classes.  The case did not hold that parcel-by-parcel analysis was required.  It held that the water district charged categories disproportionately "without a corresponding showing in the record that such impact is justified under [Proposition 218]."  (*Palmdale*, *supra*, 198 Cal.App.4th at p. 937.)

Apportionment is not a determination that lends itself to precise calculation.  (*White v. County of San Diego* (1980) 26 Cal.3d 897, 903.)  In the context of determining the validity of a fee imposed upon water appropriators by the State Water Resources Control Board, the Supreme Court has recently held that "The question of proportionality is not measured on an individual basis.  Rather, it is measured collectively, considering all rate payers."  (*California Farm Bureau Federation v. State Water Resources Control Bd.* (2011) 51 Cal.4th 421, 438.)

Given that Proposition 218 prescribes no particular method for apportioning a fee or charge other than the amount shall not exceed the proportional cost of the service attributable to the parcel, defendant's method of grouping similar users together for the same augmentation rate and charging the users according to usage is a reasonable way to apportion the cost of service.  That there may be other methods favored by plaintiffs does not render defendant's method unconstitutional.  Proposition 218 does not require a more finely calibrated apportion.

16

<u>No fee or charge may be imposed unless it is immediately available and not for future services</u>

Plaintiffs argue that the augmentation charge will be used for future services because ordinance No. 2010-02 states that the charge will be used "to identify and determine future supplemental water projects . . . ." There is no merit to the point.

Defendant's water service consists of more than just delivering water. As mentioned, the Act authorizes defendant to levy groundwater augmentation charges to pay for purchasing, capturing, storing, and distributing supplemental water. Since one cannot rationally purchase supplemental water without identifying and determining one's needs, identifying and determining future supplemental water projects is part of defendant's present-day water service.

Pendry also complains that delivered water is one of the services and delivered water is not immediately available except to coastal properties within the delivered water zone. But, again, Pendry's complaint stems from his erroneous premise that the only property owners receiving services from defendant are the coastal landowners receiving delivered water and his failure to acknowledge that the augmentation charge pays for the activities required to prepare or implement the groundwater management program for the common benefit of all water users.

<u>Revenues may not be imposed for general governmental services where the service is available to the public at large in substantially the same manner as it is to property owners</u>

Plaintiffs reason that, since everyone is a water user, everyone benefits from the services charged to property owners via the augmentation charge. They conclude that the augmentation charge is imposed for general governmental services. We disagree with plaintiffs' analysis.

The language of article XIII D, section 6, subdivision (b)(5), concerns the purpose of fees and charges. (*Golden Hill Neighborhood Assn.*, *Inc*. *v*. *City of San Diego* (2011)

17

199 Cal.App.4th 416, 434, fn. 17.) "The key is that the revenues derived from the fee or charge are required to provide the service, and may be used only for the service." (*Howard Jarvis Taxpayers Assn. v. City of Roseville* (2002) 97 Cal.App.4th 637, 648.) Defendant is not using money from the augmentation charge for "general governmental service." (§ 6, subd. (b)(5).) Rather, it is using the money to pay for the water service provided.

CONFLICT OF INTEREST

Pendry contends that defendant's board member, Michael Dobler, who voted for ordinance No. 2010-02, had a disqualifying financial interest in the decision, and that his participation renders the ordinance void under the PRA. He points out that defendant's board of directors consists of seven members (Act, § 402) and ordinances must pass by "the affirmative vote of the majority of the members of the board" (*id.* § 410). He notes that the vote count to pass ordinance No. 2010-02 was 4 to 1 and, thus, insufficient without Dobler's vote. He complains that Dobler has an interest in entities that farm in the delivered water zone. We disagree with Pendry's contention.

The PRA was enacted by initiative in June 1974. It prohibits any public official from participating in a governmental decision in which he knows or has reason to know he has a financial interest. (Gov. Code, § 87100.) It allows a person to sue for injunctive relief and, "If it is ultimately determined that a violation has occurred and that the official action might not otherwise have been taken or approved, the court may set the official action aside as void." (*Id.* § 91003, subd. (b).) It also establishes the Fair Political Practices Commission (*id.* § 83100), which is authorized to adopt regulations to carry out the purposes and provisions of the PRA (*id.* § 83112).

"A public official has a financial interest in a decision within the meaning of Section 87100 if it is reasonably foreseeable that the decision will have a material financial effect, distinguishable from its effect on the public generally, on the official . . . ." (Gov. Code, § 87103.)

18

"The financial effect of a governmental decision on the official's economic interest is indistinguishable from the decision's effect on the public generally if . . . : [¶] . . . [¶] (c) The decision is made by the governing board of a water, irrigation, or similar district to establish or adjust assessments, taxes, fees, charges, or rates or other similar decisions, such as the allocation of services, which are applied on a proportional or 'across-the-board' basis on the official's economic interests and ten percent of the property owners or other persons receiving services from the official's agency." (Cal. Code Regs., tit. 2, § 18707.2, subd. (c) (regulation).)

Here, there is no serious question that (1) defendant is a water, irrigation, or similar district, and (2) the decision effected an adjustment to charges or rates.

Pendry disputes that the ordinance applies the charges proportionally and across the board to persons receiving services from defendant. He urges that the augmentation charge is imposed upon approximately 2400 parcels located within defendant's boundaries but only a handful of those properties receive the delivered water service (Dobler included) and can expect to benefit from the greater service, reliability, improved water quality from the delivered water supply. This, however, is merely another variant of Pendry's erroneous premise that the only property owners receiving services from defendant are the coastal landowners receiving delivered water.

The augmentation charge affects those on whom it is imposed by burdening them with an expense they will bear proportionately to the amount of groundwater they extract at a rate depending on which of three rate classes applies. It is imposed "across-the-board" on all water extractors. All persons extracting water--including any coastal users who choose to do so--will pay an augmentation charge per acre-foot extracted. All persons extracting water and paying the charge will benefit in the continued availability of usable groundwater. That there is a separate charge for delivered water has no tendency to establish that the augmentation charge is applied to the interests of extractors in a manner that is anything other than proportional and across-the-board. It is plain that

19

the ordinance satisfies the terms of regulation section 18707.2, subdivision (c), such that the "public generally" exception in the PRA applies to Dobler's vote.[10]  (See *Amrhein*, *supra*, 150 Cal.App.4th at pp. 1395-1396 (conc. opn. of Bamattre-Manoukian, J.).)

ORDINANCE NO. 2002-02 AND 1993 MANAGEMENT FEE

In *Eiskamp*, the plaintiff challenged ordinance No. 2002-02 on the ground that it was invalid because defendant did not comply "with the notice, hearing, and voting requirements of [Proposition 218]." (*Eiskamp*, *supra*, 203 Cal.App.4th at p. 102.)  We concluded that the challenge was barred by the doctrine of res judicata because the 2008 stipulated judgment in the Pending Litigation resolved the issue against all persons.  We specifically held that "Since the pending litigation was a validation proceeding, the judgment entered pursuant to the stipulated agreement was 'binding and conclusive . . . against [defendant] and against all other persons' (Code Civ. Proc., § 870, subd. (a)), including Eiskamp." (*Id*. at p. 106.)  Since Pendry raises the same claim as the plaintiff in *Eiskamp*,[11] his challenge is also barred.

Pendry disagrees.  He asserts that *Eiskamp* was wrongly decided because "the in pro per plaintiff in *Eiskamp* did not properly present the correct facts or law to this Court."  According to Pendry, the Consolidated Lawsuits were not in rem validation

---

[10] Pendry claims that the trial court did not find that the "public generally" exception applies in this case.  It is true that the trial court's reasoning is ambiguous.  The trial court's statement of decision finds against "a conflict of interest which could support the voiding of the subject Ordinance."  The finding could be construed to mean that (1) Dobler had no disqualifying financial interest, (2) the "public generally" exception applied to Dobler's financial interest, or (3) Dobler's financial interest did not justify the discretionary remedy to void the ordinance.  Pendry's point is of no moment.  The parties argued the "public generally" exception to the trial court.  The salient facts are undisputed.  And Pendry urges us to review the PRA issue de novo because it involves statutory interpretation on undisputed facts.

[11] The plaintiff in *Eiskamp* did not challenge the 1993 management-fee ordinance as does Pendry, but the management-fee ordinance stands on the same footing as the augmentation-charge ordinance since it was part of the stipulated judgment.

20

proceedings insofar as ordinance No. 2002-02 was concerned because, in *Scurich* (the case that challenged that ordinance via a reverse validation action), our reversal upheld the trial court's dismissal of the in rem validation cause of action and remanded for trial an in personam declaratory-relief cause of action. From this, Pendry reasons that ordinance No. 2002-02 was "not under attack" such that there was in rem jurisdiction in the Consolidated Lawsuits. Pendry concludes that the stipulated judgment only binds parties to the stipulated agreement and, since he was not a party,[12] he is free to relitigate. Pendry's analysis is erroneous.

The settlement agreement served to resolve " '*all matters raised* in the Consolidated Lawsuits and the Amrhein Lawsuit (collectively the "Pending Litigation").' " (*Eiskamp*, *supra*, 203 Cal.App.4th at p. 102, italics added.) Specifically, the parties extinguished " 'any and all claims arising out of the Pending Litigation all issues, transactions and/or related claims or actions including *all claims that the parties have made* or could have made with respect to the validity of *any Augmentation Charge or Management Fee ordinances currently in effect . . . .*' " (*Ibid*., italics added.)

In the Pending Litigation, the "judgment was entered pursuant to the terms of the stipulated agreement." (*Eiskamp*, *supra*, 203 Cal.App.4th at p. 102.) Since the Amrhein Lawsuit was a validation proceeding and part of the Pending Litigation, all persons are bound by the judgment. (Code Civ. Proc., § 870, subd. (a).) And since the judgment extinguished all claims that the parties, which includes all persons given that validation character of *Amrhein*, had made concerning any augmentation charge or management fee then in effect, Pendry cannot relitigate the claims here. Pendry concedes as much by recognizing that "the plaintiffs and defendants in *Scurich* and *Amrhein* [all persons]

---

[12] Plaintiff McGrath was a party to the stipulated agreement but he excepted himself from the causes of action herein that challenge ordinance No. 2002-02 and the management fee ordinance.

21

stipulated in private settlement discussions to accept money in exchange for foregoing their individual right to attack Ordinance 2002-02 in the future." That ordinance No. 2002-02 was not technically under attack at the time of the judgment does not detract from that the Pending Litigation was a validation proceeding that comprehensively extinguished all claims that had been made, or could have been made about the validity of any augmentation charge or management fee then in effect. This necessarily includes claims against ordinance No. 2002-02 and the 1993 Management Fee.[13]

Pendry claims that applying res judicata against him transgresses due process. However, his argument is premised on the trial court's conclusion that res judicata applied because he was in privity with the parties in the Pending Litigation. Our conclusion is that res judicata applies because, by virtue of the validation character of the Pending Litigation, he was a party to the Pending Litigation.

DISPOSITION

The judgment in H038087 (Santa Cruz County Superior Court case No. CV168936-Griffith) is affirmed.

The judgment in H038264 (Santa Cruz County Superior Court case No. CV169080-Pendry) is affirmed.

---

[13] Defendant's request to take judicial notice of three letters requesting depublication of *Eiskamp* and four letters supporting a petition for review of *Eiskamp* is denied.

_____

                                        Premo, J.

WE CONCUR:


_____

Rushing, P.J.


_____

Elia, J.


Griffith v. Pajaro Valley Water Management Agency
H038087
Pendry et al. v. Pajaro Valley Water Management Agency
H038264

| | |
|---|---|
| Trial Court: | Santa Cruz County Superior Court<br>Superior Court Nos. CV168936,<br>                       CV169080 |
| Trial Judge: | Hon. Timothy Volkmann |
| Counsel for Plaintiff/Appellant:<br>Harold Griffith<br><br>**Case No: H038087**<br>**Superior Court Case No: CV168936** | In pro. per. |
| Counsel for Plaintiffs/Appellants:<br>Joseph P. Pendry, James Spain, Yuet-Ming Chu, William McGrath, Henry Schimpeler<br><br>**Case No: H038264**<br>**Superior Court Case No: CV169080** | Johnson & James<br>Robert K. Johnson |
| Counsel for Defendant/Respondent:<br>Pajaro Valley Water Management Agency | Colantuono & Levin<br>Michael G. Colantuono<br>Amy C. Sparrow<br>Michael R. Cobden<br><br>Atchison, Barisone, Condotti &<br>Kovacevich<br>George J. Kovacevich<br>Anthony P. Condotti<br>S. Adair Paterno |
| Amicus Curiae on behalf of<br>Respondents for Association of<br>California Water Agencies and<br>California State Association of<br>Counties | Aleshire & Wynder<br>Patricia J. Quilizapa |

Griffith v. Pajaro Valley Water Management Agency
H038087
Pendry et al. v. Pajaro Valley Water Management Agency
H038264