Filed 1/19/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| NEWHALL COUNTY WATER DISTRICT, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> CASTAIC LAKE WATER AGENCY et al., <br><br> Defendants and Appellants. | B257964 <br><br> (Los Angeles County Super. Ct. No. BS142690) |

APPEAL from a judgment of the Superior Court for the County of Los Angeles. James C. Chalfant, Judge.  Affirmed.

Best Best & Krieger, Jeffrey V. Dunn, and Kimberly E. Hood for Defendants and Appellants.

Colantuono, Highsmith & Whatley, Michael G. Colantuono, David J. Ruderman, Jon R. di Cristina; Lagerlof, Senecal, Gosney & Kruse and Thomas S. Bunn III for Plaintiff and Respondent.

_____

**SUMMARY**

Plaintiff Newhall County Water District (Newhall), a retail water purveyor, challenged a wholesale water rate increase adopted in February 2013 by the board of directors of defendant Castaic Lake Water Agency (the Agency), a government entity responsible for providing imported water to the four retail water purveyors in the Santa Clarita Valley. The trial court found the Agency's rates violated article XIII C of the California Constitution (Proposition 26). Proposition 26 defines any local government levy, charge or exaction as a tax requiring voter approval, unless (as relevant here) it is imposed "for a specific government service or product provided directly to the payor that is not provided to those not charged, and which does not exceed the reasonable costs to the local government of providing the service or product." (Cal. Const., art. XIII C, § 1, subd. (e)(2).)[1]

The challenged rates did not comply with this exception, the trial court concluded, because the Agency based its wholesale rate for imported water in substantial part on Newhall's use of groundwater, which was not supplied by the Agency. Consequently, the wholesale water cost allocated to Newhall did not, as required, "bear a fair or reasonable relationship to [Newhall's] burdens on, or benefits received from, the [Agency's] activity." (Art. XIII C, § 1, subd. (e), final par.)

We affirm the trial court's judgment.

**FACTS**

We base our recitation of the facts in substantial part on the trial court's lucid descriptions of the background facts and circumstances giving rise to this litigation.

**1.      The Parties**

The Agency is a special district and public agency of the state established in 1962 as a wholesale water agency to provide imported water to the water purveyors in the Santa Clarita Valley. It is authorized to acquire water and water rights, and to provide, sell and deliver that water "at wholesale only" for municipal, industrial, domestic and

---

[1]      All further references to any "article" are to the California Constitution.

2

other purposes.  (Wat. Code Appen., § 103-15.)  The Agency supplies imported water, purchased primarily from the State Water Project, to four retail water purveyors, including Newhall.

Newhall is also a special district and public agency of the state.  Newhall has served its customers for over 60 years, providing treated potable water to communities near Santa Clarita, primarily to single family residences.  Newhall owns and operates distribution and transmission mains, reservoirs, booster pump stations, and 11 active groundwater wells.

Two of the other three retail water purveyors are owned or controlled by the Agency:  Santa Clarita Water Division (owned and operated by the Agency) and Valencia Water Company (an investor-owned water utility controlled by the Agency since December 21, 2012).  Through these two retailers, the Agency supplies about 83 percent of the water demand in the Santa Clarita Valley.  The Agency's stated vision is to manage all water sales in the Santa Clarita Valley, both wholesale and retail.

The fourth retailer is Los Angeles County Waterworks District No. 36 (District 36), also a special district and public agency, operated by the County Department of Public Works.  It is the smallest retailer, accounting for less than 2 percent of the total water demand.

## 2.    Water Sources

The four retailers obtain the water they supply to consumers from two primary sources, local groundwater and the Agency's imported water.

The only groundwater source is the Santa Clara River Valley Groundwater Basin, East Subbasin (the Basin).  The Basin is comprised of two aquifer systems, the Alluvium and the Saugus Formation.  This groundwater supply alone cannot sustain the collective demand of the four retailers.  (The Basin's operational yield is estimated at 37,500 to 55,000 acre-feet per year (AFY) in normal years, while total demand was projected at 72,343 AFY for 2015, and 121,877 AFY in 2050.)

The groundwater basin, so far as the record shows, is in good operating condition, with no long-term adverse effects from groundwater pumping.  Such adverse effects

3

(known as overdraft) could occur if the amount of water extracted from an aquifer were to exceed the amount of water that recharges the aquifer over an extended period. The retailers have identified cooperative measures to be taken, if needed, to ensure sustained use of the aquifer. These include the continued "conjunctive use" of imported supplemental water and local groundwater supplies, to maximize water supply from the two sources. Diversity of supply is considered a key element of reliable water service during dry years as well as normal and wet years.

In 1997, four wells in the Saugus Formation were found to be contaminated with perchlorate, and in 2002 and 2005, perchlorate was detected in two wells in the Alluvium. All the wells were owned by the retailers, one of them by Newhall. During this period, Newhall and the two largest retailers (now owned or controlled by the Agency) increased their purchases of imported water significantly.

**3. Use of Imported Water**

Until 1987, Newhall served its customers relying only on its groundwater rights.[2] Since 1987, it has supplemented its groundwater supplies with imported water from the Agency.

The amount of imported water Newhall purchases fluctuates from year to year. In the years before 1998, Newhall's water purchases from the Agency averaged 11 percent of its water demand. During the period of perchlorate contamination (1998-2009), its imported water purchases increased to an average of 52 percent of its total demand. Since then, Newhall's use of imported water dropped to 23 percent, and as of 2012,

---

[2]       Newhall has appropriative water rights that arise from California's first-in-time-first-in-right allocation of limited groundwater supplies. (See *El Dorado Irrigation Dist. v. State Water Resources Control Board* (2006) 142 Cal.App.4th 937, 961 [" '[T]he appropriation doctrine confers upon one who actually diverts and uses water the right to do so provided that the water is used for reasonable and beneficial uses and is surplus to that used by riparians or earlier appropriators.' "]; *City of Barstow v. Mojave Water Agency* (2000) 23 Cal.4th 1224, 1241 [" 'As between appropriators, . . . the one first in time is the first in right, and a prior appropriator is entitled to all the water he needs, up to the amount he has taken in the past, before a subsequent appropriator may take any [citation].' "].)

Newhall received about 25 percent of its total water supply from the Agency.  The overall average since it began to purchase imported water in 1987, Newhall tells us, is 30 percent.

The other retailers, by contrast, rely more heavily on the Agency's imported water.  Agency-owned Santa Clarita Water Division is required by statute to meet at least half of its water demand using imported water.  (See Wat. Code Appen., § 103-15.1, subd. (d).)  Agency-controlled Valencia Water Company also meets almost half its demand with imported water.

### 4.     The Agency's Related Powers and Duties

As noted above, the Agency's primary source of imported water is the State Water Project.  The Agency purchases that water under a contract with the Department of Water Resources.  The Agency also acquires water under an acquisition agreement with the Buena Vista Water Storage District and the Rosedale-Rio Bravo Water Storage District, and other water sources include recycled water and water stored through groundwater banking agreements.  Among the Agency's powers are the power to "[s]tore and recover water from groundwater basins" (Wat. Code Appen., § 103-15.2, subd. (b)), and "[t]o restrict the use of agency water during any emergency caused by drought, or other threatened or existing water shortage, and to prohibit the wastage of agency water" (§ 103-15, subd. (k)).

In addition, and as pertinent here, the Agency may "[d]evelop groundwater management plans within the agency which may include, without limitation, conservation, overdraft protection plans, and groundwater extraction charge plans . . . ."  (Wat. Code Appen., § 103-15.2, subd. (c).)  The Agency has the power to implement such plans "subject to the rights of property owners and with the approval of the retail water purveyors and other major extractors of over 100 acre-feet of water per year." (*Ibid.*)

In 2001, the Legislature required the Agency to begin preparation of a groundwater management plan, and provided for the formation of an advisory council consisting of representatives from the retail water purveyors and other major extractors.

5

(Wat. Code Appen., § 103-15.1, subd. (e)(1)&(2)(A).) The Legislature required the Agency to "regularly consult with the council regarding all aspects of the proposed groundwater management plan." (*Id.*, subd. (e)(2)(A).)

Under this legislative authority, the Agency spearheaded preparation of the 2003 Groundwater Management Plan for the Basin, and more recently the 2010 Santa Clarita Valley Urban Water Management Plan. These plans were approved by the retailers, including Newhall.

The 2003 Groundwater Management Plan states the overall management objectives for the Basin as: (1) development of an integrated surface water, groundwater, and recycled water supply to meet existing and projected demands for municipal, agricultural and other water uses; (2) assessment of groundwater basin conditions "to determine a range of operational yield values that will make use of local groundwater conjunctively with [State Water Project] and recycled water to avoid groundwater overdraft"; (3) preservation of groundwater quality; and (4) preservation of interrelated surface water resources. The 2010 Santa Clarita Valley Urban Water Management Plan, as the trial court described it, is "an area-wide management planning tool that promotes active management of urban water demands and efficient water usage by looking to long-range planning to ensure adequate water supplies to serve existing customers and future demands . . . ."

## 5.     The Agency's Wholesale Water Rates

The board of directors of the Agency fixes its water rates, "so far as practicable, [to] result in revenues that will pay the operating expenses of the agency, . . . provide for the payment of the cost of water received by the agency under the State Water Plan, provide for repairs and depreciation of works, provide a reasonable surplus for improvements, extensions, and enlargements, pay the interest on any bonded debt, and provide a sinking or other fund for the payment of the principal of that bonded debt . . . ." (Wat. Code Appen., § 103-24, subd. (a).) The Agency's operating costs include costs for management, administration, engineering, maintenance, water quality compliance, water resources, water treatment operations, storage and recovery programs, and studies.

6

Before the rate changes at issue here, the Agency had a "100 percent variable" rate structure. That means it charged on a per acre-foot basis for the imported water sold, known as a "volumetric" rate. Thus, as of January 1, 2012, retailers were charged $487 per acre-foot of imported water, plus a $20 per acre-foot charge for reserve funding.

Because of fluctuations in the demand for imported water (such as during the perchlorate contamination period), the Agency's volumetric rates result in fluctuating, unstable revenues. The Agency engaged consultants to perform a comprehensive wholesale water rate study, and provide recommendations on rate structure options. The objective was a rate structure that would provide revenue sufficiency and stability to the Agency, provide cost equity and certainty to the retailers, and enhance conjunctive use of the sources of water supply and encourage conservation. As the Agency's consultants put it, "[t]wo of the primary objectives of cost of service water rates are to ensure the utility has sufficient revenue to cover the costs of operating and maintaining the utility in a manner that will ensure long term sustainability and to ensure that costs are recovered from customers in a way that reflects the demands they place on the system."

The general idea was a rate structure with both volumetric and fixed components. Wholesale rate structures that include both a fixed charge component (usually calculated to recover all or a portion of the agency's fixed costs of operating, maintaining and delivering water) and a volumetric component (generally calculated based on the cost of purchased water, and sometimes including some of the fixed costs) are common in the industry.

## 6.     The Challenged Rates

The Agency's consultants presented several rate structure options. In the end, the option the Agency chose (the challenged rates) consisted of two components. The first component is a fixed charge based on each retailer's three-year rolling average of total water demand (that is, its demand for the Agency's imported water *and* for groundwater not supplied by the Agency). This fixed charge is calculated by "divid[ing] the Agency's total fixed revenue for the applicable fiscal year . . . by the previous three-year average of total water demand of the applicable Retail Purveyor to arrive at a unit cost per acre

7

foot." The Agency would recover 80 percent of its costs through the fixed component of the challenged rates. The second component of the Agency's rate is a variable charge, based on a per acre foot charge for imported water.[3]

The rationale for recovering the Agency's fixed costs in proportion to the retailers' total water demand, rather than their demand for imported water, is this (as described in the consultants' study):

"This rate structure meets the Agency's objective of promoting resource optimization, conjunctive use, and water conservation. Since the fixed cost is allocated on the basis of each retail purveyor's total demand, if a retail purveyor conserves water, then its fixed charge will be reduced. Additionally, allocating the fixed costs based on total water demand recognizes that imported water is an important standby supply that is available to all retail purveyors, and is also a necessary supply to meet future water demand in the region, and that there is a direct nexus between groundwater availability and imported water use – i.e., it allocates the costs in a manner that bears a fair and reasonable relationship to the retail purveyors' burdens on and benefits from the Agency's activities in ensuring that there is sufficient water to meet the demands of all of the retail purveyors and that the supply sources are responsibly managed for the benefits of all of the retail purveyors."

The rationale continues: "Moreover, the Agency has taken a leadership role in maintaining the health of the local groundwater basin by diversifying the Santa Clarita Valley's water supply portfolio, as demonstrated in the 2003 Groundwater Management Plan and in resolving perchlorate contamination of the Saugus Formation aquifer. Thus, since all retail purveyors benefit from imported water and the Agency's activities, they should pay for the reasonable fixed costs of the system in proportion to the demand (i.e.

---

[3]  There was also a $20 per acre foot reserve charge to fund the Agency's operating reserves, but the Agency reports in its opening brief that it suspended implementation of that charge as of July 1, 2013, when reserve fund goals were met earlier than anticipated.

burdens) they put on the total water supply regardless of how they utilize individual sources of supply."

The Agency's rate study showed that, during the first year of the challenged rates (starting July 1, 2013), Newhall would experience a 67 percent increase in Agency charges, while Agency controlled retailers Valencia Water Company and Santa Clarita Water Division would see reductions of 1.9 percent and 10 percent, respectively. District 36 would have a 0.8 percent increase. The rate study also indicated that, by 2050, the impact of the challenged rates on Newhall was expected to be less than under the then-current rate structure, while Valencia Water Company was expected to pay more.

Newhall opposed the challenged rates during the ratemaking process. Its consultant concluded the proposed structure was not consistent with industry standards; would provide a nonproportional, cross-subsidization of other retailers; and did not fairly or reasonably reflect the Agency's costs to serve Newhall. Newhall contended the rates violated the California Constitution and other California law. It proposed a rate structure that would base the Agency's fixed charge calculation on the annual demand for imported water placed on the Agency by each of its four customers, using a three-year rolling average of past water deliveries to each retailer.

In February 2013, the Agency's board of directors adopted the challenged rates, effective July 1, 2013.

### 7. This Litigation

Newhall sought a writ of mandate directing the Agency to rescind the rates, to refund payments made under protest, to refrain from charging Newhall for its imported water service "with respect to the volume of groundwater Newhall uses or other services [the Agency] does not provide Newhall," and to adopt a new, lawful rate structure. Newhall contended the rates were not proportionate to Newhall's benefits from, and burdens on, the Agency's service, and were therefore invalid under Proposition 26, Proposition 13, Government Code section 54999.7, and the common law of utility ratemaking.

The trial court granted Newhall's petition, finding the rates violated Proposition 26. The court concluded the Agency had no authority to impose rates based on the use of groundwater that the Agency does not provide, and that conversely, Newhall's use of its groundwater rights does not burden the Agency's system for delivery of imported water. Thus the rates bore no reasonable relationship to Newhall's burden on, or benefit received from, the Agency's service. The trial court also found the rates violated Government Code section 54999.7 (providing that a fee for public utility service "shall not exceed the reasonable cost of providing the public utility service" (Gov. Code, § 54999.7, subd. (a)), and violated common law requiring utility charges to be fair, reasonable and proportionate to benefits received by ratepayers. The court ordered the Agency to revert to the rates previously in effect until the adoption of new lawful rates, and ordered it to refund to Newhall the difference between the monies paid under the challenged rates and the monies that would have been paid under the previous rates.

Judgment was entered on July 28, 2014, and the Agency filed a timely notice of appeal.

## DISCUSSION

The controlling issue in this case is whether the challenged rates are a tax or a fee under Proposition 26.

### 1. The Standard of Review

We review de novo the question whether the challenged rates comply with constitutional requirements. (*Griffith v. City of Santa Cruz* (2012) 207 Cal.App.4th 982, 989-990 (*Griffith I*).) We review the trial court's resolution of factual conflicts for substantial evidence. (*Morgan v. Imperial Irrigation District* (2014) 223 Cal.App.4th 892, 916.)

### 2. The Governing Principles

All taxes imposed by any local government are subject to voter approval. (Art. XIII C, § 2.) Proposition 26, adopted in 2010, expanded the definition of a tax. A "tax" now includes "any levy, charge, or exaction of any kind imposed by a local government,"

10

with seven exceptions. (*Id.,* § 1, subd. (e).) This case concerns one of those seven exceptions.

Under Proposition 26, the challenged rates are not a tax, and are not subject to voter approval, if they are "[a] charge imposed for a specific government service or product provided directly to the payor that is not provided to those not charged, and which does not exceed the reasonable costs to the local government of providing the service or product." (Art. XIII C, § 1, subd. (e)(2).) The Agency "bears the burden of proving by a preponderance of the evidence" that its charge "is not a tax, that the amount is no more than necessary to cover the reasonable costs of the governmental activity, and that the manner in which those costs are allocated to a payor bear a fair or reasonable relationship to the payor's burdens on, or benefits received from, the governmental activity." (*Id.,* subd. (e), final par.)

**3. This Case**

It is undisputed that the Agency's challenged rates are designed "to recover all of its fixed costs via a fixed charge," and not to generate surplus revenue. Indeed, Newhall recognizes the Agency's right to impose a fixed water-rate component to recover its fixed costs. The dispute here is whether the fixed rate component may be based in significant part on the purchaser's use of a product – groundwater – not provided by the Agency.

We conclude the Agency cannot, consistent with Proposition 26, base its wholesale water rates on the retailers' use of groundwater, because the Agency does not supply groundwater. Indeed, the Agency does not even have the statutory authority to regulate groundwater, without the consent of the retailers (and other major groundwater extractors). As a consequence, basing its water rates on groundwater it does not provide violates Proposition 26 on two fronts.

First, the rates violate Proposition 26 because the method of allocation does not "bear a fair or reasonable relationship to the payor's burdens on, or benefits received from," the Agency's activity. (Art. XIII C, § 1, subd. (e), final par.) (We will refer to this as the reasonable cost allocation or proportionality requirement.)

11

Second, to the extent the Agency relies on its groundwater management activities to justify including groundwater use in its rate structure, the benefit to the retailers from those activities is at best indirect. Groundwater management activities are not a "service . . . provided directly to the payor that is not provided to those not charged" (art. XIII C, § 1, subd. (e)(2)), but rather activities that benefit the Basin as a whole, including other major groundwater extractors that are not charged for those services.

For both these reasons, the challenged rates cannot survive scrutiny under Proposition 26. The Agency resists this straightforward conclusion, proffering two principal arguments, melded together. The first is that the proportionality requirement is measured "collectively," not by the burdens on or benefits received by the individual purveyor. The second is that the "government service or product" the Agency provides to the four water retailers consists not just of providing wholesale water, but also of "managing the Basin water supply," including "management . . . of the Basin's groundwater." These responsibilities, the Agency argues, make it reasonable to set rates for its wholesale water service by "tak[ing] into account the entire Valley water supply portfolio and collective purveyor-benefits of promoting conjunctive use, not just the actual amount of Agency imported water purchased by each Purveyor . . . ."

Neither claim has merit, and the authorities the Agency cites do not support its contentions.

### a. *Griffin I* and the proportionality requirement

It seems plain to us, as it did to the trial court, that the demand for a product the Agency does not supply – groundwater – cannot form the basis for a reasonable cost allocation method: one that is constitutionally required to be proportional to the benefits the rate payor receives from (or the burden it places on) the Agency's activity. The Agency's contention that it may include the demand for groundwater in its rate structure because the proportionality requirement is measured "collectively," not by the burdens on or benefits to the individual retail purveyor, is not supported by any pertinent authority.

In contending otherwise, the Agency relies on, but misunderstands, *Griffith I* and other cases stating that proportionality " 'is not measured on an individual basis,' " but

12

rather " 'collectively, considering all rate payors,' " and " 'need not be finely calibrated to the precise benefit each individual fee payor might derive.' " (*Griffith I, supra,* 207 Cal.App.4th at p. 997, quoting *California Farm Bureau Federation v. State Water Resources Control Bd.* (2011) 51 Cal.4th 421, 438 [discussing regulatory fees under the Water Code and Proposition 13].) As discussed *post*, these cases do not apply here, for one or more reasons. *Griffith I* involves a different exemption from Proposition 26, and other cases involve Proposition 218, which predated Proposition 26 and has no direct application here. In addition to these distinctions – which do make a difference – the cases involved large numbers of payors, who could rationally be (and were) placed in different usage categories, justifying different fees for different classes of payors.

In *Griffith I*, the defendant city imposed an annual inspection fee for all residential rental properties in the city. The court rejected a claim that the inspection fee was a tax requiring voter approval under Proposition 26. (*Griffith I, supra,* 207 Cal.App.4th at p. 987.) *Griffith I* involves another of the seven exemptions in Proposition 26, the exemption for regulatory fees – charges imposed for the regulatory costs of issuing licenses, performing inspections, and the like. (Art. XIII C, § 1, subd. (e)(3) [expressly excepting, from the "tax" definition, a "charge imposed for the reasonable regulatory costs to a local government for . . . performing inspections"].)

The inspection fees in *Griffith I* met all the requirements of Proposition 26. The city's evidence showed the fees did not exceed the approximate cost of the inspections. (*Griffith I, supra,* 207 Cal.App.4th at p. 997.) And the proportionality requirement of Proposition 26 was also met: "The fee schedule itself show[ed] the basis for the apportionment," setting an annual registration fee plus a $20 per unit fee, with lower fees for "[s]elf-certifications" that cost the city less to administer, and greater amounts charged when reinspections were required. (*Griffith I,* at p. 997.) The court concluded: "Considered collectively, the fees are reasonably related to the payors' burden upon the inspection program. *The larger fees are imposed upon those whose properties require the most work.*" (*Ibid.*, italics added.)

13

*Griffith I* did, as the Agency tells us, state that " 'the question of proportionality is not measured on an individual basis' " but rather " 'collectively, considering all rate payors.' " (*Griffith I, supra,* 207 Cal.App.4th at p. 997.)  But, as mentioned, *Griffith I* was considering a regulatory fee, not, as here, a charge imposed on four ratepayers for a "specific government service or product."  As *Griffith I* explained, " '[t]he scope of a regulatory fee is somewhat flexible' " and " 'must be related to the overall cost of the governmental regulation,' " but " 'need not be finely calibrated to the precise benefit each individual fee payor might derive.' " (*Ibid.*)  That, of course, makes perfect sense in the context of a regulatory fee applicable to numerous payors; indeed, it would be impossible to assess such fees based on the individual payor's precise burden on the regulatory program.  But the inspection fees *were* allocated by categories of payor, and were based on the burden on the inspection program, with higher fees where more city work was required.

Here, there are four payors, with no need to group them in classes to allocate costs.  The *Griffith I* concept of measuring proportionality "collectively" simply does not apply.  Where charges for a government service or product are to be allocated among only four payors, the only rational method of evaluating their burdens on, or benefits received from, the governmental activity, is individually, payor by payor.  And that is particularly appropriate considering the nature of the Proposition 26 exemption in question:  charges for a product or service that is (and is required to be) provided "directly to the payor."  Under these circumstances, allocation of costs "collectively," when the product is provided directly to each of the four payors, cannot be, and is not, a "fair or reasonable" allocation method.  (Art. XIII C, § 1, subd. (e), final par.)

### b.      *Griffith II – the proportionality requirement and related claims*

In *Griffith v. Pajaro Valley Water Management Agency* (2013) 220 Cal.App.4th 586 (*Griffith II*), the court concluded, among other things, that a groundwater augmentation charge complied with the proportionality requirement of Proposition 218.  The Agency relies on *Griffith II*, asserting that the court applied the "concept of collective reasonableness with respect to rate allocations . . . ."  Further, the case

14

demonstrates, the Agency tells us, that its activities in "management . . . of the Basin's groundwater" justify basing its rates on total water demand, because all four retailers benefit from having the Agency's imported water available, even when they do not use it. Neither claim withstands analysis.

*Griffith II* involved a challenge under Proposition 218, so we pause to describe its relevant points. Proposition 218 contains various procedural (notice, hearing, and voting) requirements for the imposition by local governments of fees and charges "upon a parcel or upon a person as an incident of property ownership, including a user fee or charge for a property related service." (Art. XIII D, § 2, subd. (e).) Fees or charges for water service (at issue in *Griffith II*) are exempt from voter approval (art. XIII D, § 6, subd. (c)), but substantive requirements apply. These include a proportionality requirement: that the amount of a fee or charge imposed on any parcel or person "shall not exceed the proportional cost of the service attributable to the parcel." (*Id.*, subd. (b)(3).)

In *Griffith II*, the plaintiffs challenged charges imposed by the defendant water management agency on the extraction of groundwater (called a "groundwater augmentation charge"). The defendant agency had been created to deal with the issue of groundwater being extracted faster than it is replenished by natural forces, leading to saltwater intrusion into the groundwater basin. (*Griffith II, supra,* 220 Cal.App.4th at p. 590.) The defendant agency was specifically empowered to levy groundwater augmentation charges on the extraction of groundwater from all extraction facilities, " ' "for the purposes of paying the costs of purchasing, capturing, storing, and distributing supplemental water for use within [defendant's boundaries]." ' " (*Id.* at p. 591.) The defendant's strategy to do so had several facets, but its purpose was to reduce the amount of water taken from the groundwater basin by supplying water to some coastal users, with the cost borne by all users, "on the theory that even those taking water from [inland] wells benefit from the delivery of water to [coastal users], as that reduces the amount of groundwater those [coastal users] will extract [from their own wells], thereby keeping the water in [all] wells from becoming too salty.' " (*Id.* at pp. 590-591.)

15

*Griffith II* found the charge complied with the Proposition 218 requirement that the charge could not exceed the proportional costs of the service attributable to the parcel. (*Griffith II, supra,* 220 Cal.App.4th at pp. 600-601.) Proposition 218, the court concluded, did not require "a parcel-by-parcel proportionality analysis." (*Griffith II,* at p. 601.) The court found defendant's "method of grouping similar users together for the same augmentation rate and charging the users according to usage is a reasonable way to apportion the cost of service," and Proposition 218 "does not require a more finely calibrated apportion." (*Griffith II,* at p. 601.) The augmentation charge "affects those on whom it is imposed by burdening them with an expense they will bear proportionately to the amount of groundwater they extract at a rate depending on which of three rate classes applies. It is imposed 'across-the-board' on all water extractors. All persons extracting water – including any coastal users who choose to do so – will pay an augmentation charge per acre-foot extracted. All persons extracting water and paying the charge will benefit in the continued availability of usable groundwater." (*Griffith II,* at pp. 603-604.)

The court rejected the plaintiffs' claim the charge for groundwater extraction on their parcels was disproportionate because they did not use the agency's services – that is, they did not receive delivered water, as coastal landowners did. This claim, the court said, was based on the erroneous premise that the agency's only service was to deliver water to coastal landowners. The court pointed out that the defendant agency was created to manage the water resources for the common benefit of all water users, and the groundwater augmentation charge paid for the activities required to prepare and implement the groundwater management program. (*Griffith II, supra,* 220 Cal.App.4th at p. 600.) Further, the defendant agency "apportioned the augmentation charge among different categories of users (metered wells, unmetered wells, and wells within the delivered water zone)." (*Id.* at p. 601.) (The charges were highest for metered wells in the coastal zone, and there was also a per acre-foot charge for delivered water. (*Id.* at p. 593 & fn. 4.))

We see nothing in *Griffith II* that assists the Agency here. The Agency focuses on the fact that the defendant charged the plaintiff for groundwater extraction even though

16

the plaintiff received no delivered water, and on the court's statement that the defendant was created to manage water resources for the common benefit of all water users. (*Griffith II, supra,* 220 Cal.App.4th at p. 600.) From this the Agency leaps to the erroneous conclusion that the rates here satisfy the proportionality requirement simply because all four retailers "benefit from having the Agency's supplemental water supplies available," even when they do not use them. This is a false analogy. In *Griffith II,* the defendant charged all groundwater extractors proportionately for extracting water (and had the power to do so), and charged for delivered water as well. *Griffith II* does not support the imposition of charges based on a product the Agency does not supply.

We note further that in *Griffith II*, more than 1,900 parcel owners were subject to the groundwater augmentation charge, and they were placed in three different classes of water extractors and charged accordingly. (*Griffith II, supra,* 220 Cal.App.4th at pp. 593, 601.) Here, there are four water retailers receiving the Agency's wholesale water service, none of whom can reasonably be placed in a different class or category from the other three. In these circumstances, to say costs may be allocated to the four purveyors "collectively," based in significant part on groundwater not supplied by the Agency, because "they all benefit" from the availability of supplemental water supplies, would effectively remove the proportionality requirement from Proposition 26.

That we may not do. Proposition 26 requires by its terms an allocation method that bears a reasonable relationship to the payor's burdens on or benefits from the Agency's activity, which here consists of wholesale water service to be provided "directly to the payor." In the context of wholesale water rates to four water agencies, this necessarily requires evaluation on a "purveyor by purveyor" basis. (Cf. *Capistrano Taxpayers Assn., Inc. v. City of San Juan Capistrano* (2015) 235 Cal.App.4th 1493, 1514 (*Capistrano*) ["[w]hen read in context, *Griffith* [*II*] does not excuse water agencies from ascertaining the true costs of supplying water to various tiers of usage"; *Griffith II*'s "comments on proportionality necessarily relate only to variations in property location"; "trying to apply [*Griffith II*] to the [Proposition 218 proportionality] issue[] is fatally flawed"].)

17

The Agency's claim that it is not charging the retailers for groundwater use, and its attempt to support basing its rates on total water demand by likening itself to the defendant agency in *Griffith II*, both fail as well. The first defies reason. Because the rates are based on total water demand, the more groundwater a retailer uses, the more it pays under the challenged rates. The use of groundwater demand in the rate structure necessarily means that, in effect, the Agency is charging for groundwater use.

The second assertion is equally mistaken. The differences between the Agency and the defendant in *Griffith II* are patent. In *Griffith II*, the defendant agency was created to manage all water resources, and specifically to deal with saltwater intrusion into the groundwater basin. The Agency here was not. It was created to acquire water and to "provide, sell, and deliver" it. It is authorized to develop and implement groundwater management plans only with the approval of the retail water purveyors (and other major groundwater extractors). In other words, while the Agency functions as the lead agency in developing and coordinating groundwater management plans, its only authority over groundwater, as the trial court found, is a shared responsibility to develop those plans. Further, in *Griffith II*, the defendant agency was specifically empowered to levy groundwater extraction charges for the purpose of purchasing supplemental water. The Agency here was not. As the trial court here aptly concluded, *Griffith II* "does not aid [the Agency] for the simple reason that [the Agency] has no comprehensive authority to manage the water resources of the local groundwater basin and levy charges related to groundwater."[4]

Finally, the Agency insists that it "must be allowed to re-coup its cost of service," and that the practice of setting rates to recover fixed expenses, "irrespective of a customer's actual consumption," was approved in *Paland v. Brooktrails Township*

---

[4] The trial court also observed that, "[a]part from [the Agency's] lack of authority to supply or manage Basin groundwater, Newhall correctly notes that [the Agency] has presented no evidence of its costs in maintaining the Basin."

18

*Community Services Dist. Bd. of Directors* (2009) 179 Cal.App.4th 1358 (*Paland*). *Paland* has no application here.

*Paland* involved Proposition 218. As we have discussed, Proposition 218 governs (among other things) "property related fees and charges" on parcels of property. Among its prohibitions is any fee or charge for a service "unless that service is actually used by, or immediately available to, the owner of the property in question." (Art. XIII D, § 6, subd. (b)(4).) The court held that a minimum charge, imposed on parcels of property with connections to the district's utility systems, for the basic cost of providing water service, regardless of actual use, was "a charge for an immediately available property-related water or sewer service" within the meaning of Proposition 218, and not an assessment requiring voter approval. (*Paland, supra,* 179 Cal.App.4th at p. 1362; see *id.* at p. 1371 ["Common sense dictates that continuous maintenance and operation of the water and sewer systems is necessary to keep those systems immediately available to inactive connections like [the plaintiff's]."].)

We see no pertinent analogy between *Paland* and this case. This case does not involve a minimum charge imposed on all parcels of property (or a minimum charge for standing ready to supply imported water). Newhall does not contest the Agency's right to charge for its costs of standing ready to provide supplemental water, and to recoup all its fixed costs. The question is whether the Agency may recoup those costs using a cost allocation method founded on the demand for groundwater the Agency does not supply, and is not empowered to regulate without the consent of groundwater extractors. The answer under Proposition 26 is clear: it may not. *Paland* does not suggest otherwise.[5]

---

[5] The parties refer to other recent authorities to support their positions in this case. We may not rely on one of them, because the Supreme Court has granted a petition for review. (*City of San Buenaventura v. United Water Conservation District* (2015) 235 Cal.App.4th 228, review granted June 24, 2015, S226036.) The Agency cites the other case extensively in its reply brief, but we see nothing in that case to suggest that the challenged rates here comply with Proposition 26. (*Great Oaks Water Co. v. Santa Clara Valley Water District* 242 Cal.App.4th 1187 (*Great Oaks*).)

19

### c.    Other claims – conservation and "conjunctive use"

The Agency attempts to justify the challenged rates by relying on the conservation mandate in the California Constitution, pointing out it has a constitutional obligation to encourage water conservation. (Art. X, § 2 [declaring the state's water resources must "be put to beneficial use to the fullest extent of which they are capable, and that the waste or unreasonable use or unreasonable method of use of water [must] be prevented"].) The challenged rates comply with this mandate, the Agency contends, because reducing total water consumption will result in lower charges, and the rates encourage "a coordinated use of groundwater and supplemental water" (conjunctive use). This argument, too, misses the mark.

---

The Agency's brief fails to describe the circumstances in *Great Oaks*. There, a water retailer challenged a groundwater extraction fee imposed by the defendant water district. Unlike this case, the defendant in *Great Oaks* was authorized by statute to impose such fees, and its major responsibilities included "preventing depletion of the aquifers from which [the water retailer] extracts the water it sells." (*Great Oaks, supra,* 242 Cal.App.4th at p. 1197.) The Court of Appeal, reversing a judgment for the plaintiff, held (among other things) that the fee was a property-related charge, and therefore subject to some of the constraints of Proposition 218, but was also a charge for water service, and thus exempt from the requirement of voter ratification. (*Great Oaks,* at p. 1197.) The trial court's ruling in *Great Oaks* did not address the plaintiff's contentions that the groundwater extraction charge violated three substantive limitations of Proposition 218, and the Court of Appeal ruled that one of those contentions (that the defendant charged more than was required to provide the property related service on which the charge was predicated) could be revisited on remand. The others were not preserved in the plaintiff's presuit claim, so no monetary relief could be predicated on those theories. (*Great Oaks,* at pp. 1224, 1232-1234.)

The Agency cites *Greak Oaks* repeatedly, principally for the statements that the "provision of alternative supplies of water serves the long-term interests of extractors by reducing demands on the groundwater basin and helping to prevent its depletion," and that it was not irrational for the defendant water district "to conclude that reduced demands on groundwater supplies benefit retailers by preserving the commodity on which their long-term viability, if not survival, may depend." (*Great Oaks, supra,* 242 Cal.App.4th at pp. 1248-1249.) These statements, with which we do not disagree, have no bearing on this case, and were made in connection with the court's holding that the trial court erred in finding the groundwater extraction charge violated the statute that created and empowered the defendant water district. (*Id.* at pp. 1252-1253.)

Certainly the Agency may structure its rates to encourage conservation of the imported water it supplies. (Wat. Code, § 375, subd. (a) [public entities supplying water at wholesale or retail may "adopt and enforce a water conservation program to reduce the quantity of water used by [its customers] for the purpose of conserving the water supplies of the public entity"]. But the Agency has no authority to set rates to encourage conservation of groundwater it does not supply. Moreover, article X's conservation mandate cannot be read to eliminate Proposition 26's proportionality requirement. (See *City of Palmdale v. Palmdale Water District* (2011) 198 Cal.App.4th 926, 936-937 ["California Constitution, article X, section 2 is not at odds with article XIII D [Proposition 218] so long as, for example, conservation is attained in a manner that 'shall not exceed the proportional cost of the service attributable to the parcel.' "]; see *id.* at p. 928 [district failed to prove its water rate structure complied with the proportionality requirement of Proposition 218]; see also *Capistrano, supra,* 235 Cal.App.4th at p. 1511, quoting *City of Palmdale* with approval.)

The Agency also insists that basing its rates only on the demand for the imported water it actually supplies – as has long been the case – would "discourage users from employing conjunctive use . . . ." The Agency does not explain how this is so, and we are constrained to note that, according to the Agency's own 2003 Groundwater Management Plan, Newhall and the other retailers "have been practicing the conjunctive use of imported surface water and local groundwater" for many years. And, according to that plan, the Agency and retailers have "a historical and ongoing working relationship . . . to manage water supplies to effectively meet water demands within the available yields of imported surface water and local groundwater."

In connection, we assume, with its conjunctive use rationale, the Agency filed a request for judicial notice, along with its reply brief. It asked us to take notice of three documents and "the facts therein concerning imported water use and local groundwater production" by Newhall and the other water retailers. The documents are the 2014 and 2015 Water Quality Reports for the Santa Clarita Valley, and a water supply utilization table from the 2014 Santa Clarita Valley Water Report published in June 2015. All of

21

these, the Agency tells us, are records prepared by the Agency and the four retailers, after the administrative record in this case was prepared. The documents "provide further support" as to the "cooperative efforts of the Agency and the Purveyors in satisfying long-term water supply needs," and "provide context and useful background to aid in the Court's understanding of this case." The Agency refers to these documents in its reply brief, pointing out that since 2011, Newhall has increased its imported water purchases because of the impact of the current drought on certain of its wells, while retailer Valencia Water Company increased groundwater pumping and purchased less imported water in 2014. These cooperative efforts, the Agency says, "reflect the direct benefit to Newhall of having an imported water supply available to it, whether or not it maximizes use of imported water in a particular year."

We deny the Agency's request for judicial notice. We see no reason to depart from the general rule that courts may not consider evidence not contained in the administrative record. (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 564; cf. *id.* at p. 578 [the exception to the rule in administrative proceedings, for evidence that could not have been produced at the hearing through the exercise of reasonable diligence, applies in "rare instances" where the evidence in question existed at the time of the decision, or in other "unusual circumstances"].) Denial is particularly appropriate where judicial notice has been requested in support of a reply brief to which the opposing party has no opportunity to respond, and where the material is, as the Agency admits, "further support" of evidence in the record, providing "context and useful background." These are not unusual circumstances.

Returning to the point, neither conservation mandates nor the Agency's desire to promote conjunctive use – an objective apparently shared by the retailers – permits the Agency to charge rates that do not comply with Proposition 26 requirements. Using demand for groundwater the agency does not supply to allocate its fixed costs may "satisf[y] the Agency's constitutional obligations . . . to encourage water conservation,"

22

but it does not satisfy Proposition 26, and it therefore cannot stand.[6] (Cf. *Capistrano, supra,* 235 Cal.App.4th at pp. 1511, 1498 [conservation is to be attained in a manner not exceeding the proportional cost of service attributable to the parcel under Proposition 218; the agency failed to show its tiered rates complied with that requirement].)

### d. Other Proposition 26 requirements

We have focused on the failure of the challenged rates to comply with the proportionality requirement of Proposition 26. But the rates do not withstand scrutiny for another reason as well. Proposition 26 exempts the Agency's charges from voter approval only if the charge is imposed "for a specific government service or product provided *directly* to the payor that is *not* provided to those not charged . . . ." (Italics added.) The only "specific government service or product" the Agency provides directly to the retailers, and not to others, is imported water. As the trial court found: the Agency "does not provide Newhall groundwater. It does not maintain or recharge aquifers. It does not help Newhall pump groundwater. Nor does it otherwise contribute directly to the natural recharge of the groundwater Newhall obtains from its wells."

The groundwater management activities the Agency *does* provide – such as its leadership role in creating groundwater management plans and its perchlorate remediation efforts – are not specific services the Agency provides directly to the retailers, and not to other groundwater extractors in the Basin. On the contrary, groundwater management services redound to the benefit of all groundwater extractors in the Basin – not just the four retailers. Indeed, implementation of any groundwater

---

[6] The Agency also cites *Brydon v. East Bay Municipal Utility District* (1994) 24 Cal.App.4th 178 for the principle that, in pursuing a constitutionally and statutorily mandated conservation program, "cost allocations . . . are to be judged by a standard of reasonableness with some flexibility permitted to account for system-wide complexity." (*Id.* at p. 193.) But *Brydon* predated both Proposition 218 and Proposition 26. (See *Capistrano, supra,* 235 Cal.App.4th at pp. 1512-1513 [*Brydon* "simply has no application to post-Proposition 218 cases"; "it seems safe to say that *Brydon* itself was part of the general case law which the enactors of Proposition 218 wanted replaced with stricter controls on local government discretion"].)

management plan is "subject to the rights of property owners and with the approval of the retail water purveyors *and other major extractors* of over 100 acre-feet of water per year." (Wat. Code Appen., § 103-15.2, subds. (b)&(c), italics added.)

Certainly the Agency may recover through its water rates its entire cost of service – that is undisputed. The only question is whether those costs may be allocated, consistent with Proposition 26, based in substantial part on groundwater use. They may not, because the Agency's groundwater management activities plainly are not a service "that is not provided to those not charged . . . ." (Art. XIII C, § 1, subd. (e)(2).)

In light of our conclusion the challenged rates violate Proposition 26, we need not consider the Agency's contention that the rates comply with Government Code section 54999.7 and the common law. Nor need we consider the propriety of the remedy the trial court granted, as the Agency raises no claim of error on that point.

## DISPOSITION

The judgment is affirmed. Plaintiff shall recover its costs on appeal.

GRIMES, J.

WE CONCUR:

BIGELOW, P. J.                    FLIER, J.

24